***********
The Full Commission reviewed the prior Order and prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner DeLuca and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence, the Full Commission reverses the Deputy Commissioner's denial of benefits and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at and prior to the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Commission and the Commission has jurisdiction of the parties and of the subject matter.
2. All parties have been correctly designated and there is no question as to misjoinder or nonjoinder of parties.
3. The appointment of any party who appears in a representative capacity is valid and said party is duly qualified and no additional proof of appointment or capacity shall be required.
4. In addition to other stipulations contained herein the parties stipulate and agree with respect to the following undisputed facts:
(a) An employee/employer relationship existed between plaintiff and Kyocera on July 15, 2002;
(b) Plaintiff was employed by Kyocera as a Quality Control Inspector;
(c) The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act; and
(d) Plaintiff's average weekly wage is $418.60, which yields a compensation rate of $279.07.
 ***********
Based upon the greater weight of the competent and credible evidence of record in this matter and reasonable inferences flowing therefrom, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. Plaintiff was born on May 4, 1954. Prior to his employment with Kyocera Industrial Ceramics, Inc. (hereafter Kyocera), plaintiff had a long work history of heavy labor jobs, including work as a welder, fabricator, auto body repairman, and work in a steel shop.
3. Kyocera manufactures a variety of types and sizes of ceramic and other parts.
4. Plaintiff began working for Kyocera through a temporary service in January 2000. Kyocera then hired plaintiff as an employee in May, 2000. His position was that of a quality control inspector, although he spent most of his time dyeing ceramic parts.
5. Plaintiff's primary job duties included dyeing parts, measuring parts, and doing paperwork. The dyeing of parts consisted of removing parts ranging in weight up to 80 pounds from the shelves of a cart located near his work station, holding the parts at just above waist level in the dye which filled the dye tank for about 30 seconds, and then lifting the parts out of the dye to let excess dye drip off. Plaintiff then lowered the parts into the adjacent twin sink, rinsed the parts and placed them back on the cart. During the dyeing process, plaintiff did not let the parts rest on the bottom of the sink because of the sludge that collected there. Although conflicting testimony was offered on this point, it is found as a fact that plaintiff dyed parts more than half of the workday.
6. Plaintiff's workstation consisted of large twin side-by-side stainless steel sinks. One sink contained the dye and the other was used to rinse the parts after they were dyed. The top of the sinks was higher than plaintiff's waist.
7. Plaintiff dyed five different types of parts, which he described as wear, wire semicon, dry press and paper parts. The "wear" parts were circular in shape, varied in size and ranged in weight from one to 36 pounds. The "wire" parts were also circular, had a hole in the middle and ranged in size from two to 65 pounds. The "semicon" parts also were round in shape with a hole in the middle and weighed from two to 80 pounds. "Dry press" parts were small; 1500 to 3100 parts fit in a basket at a time and it was not unusual to dye around 300,000 parts of "dry press" during a single day. Paper parts also were small and were dyed in a basket that weighed from 20 to 30 pounds. Due to pressure to complete the work, plaintiff dyed two baskets in a time, resulting in a combined weight of 40 to 60 pounds.
8. The dyeing process required constant upper body motions, primarily with arms and shoulders. The motion of plaintiff using his arms and shoulders to lift products from a cart, hold them suspended in the dye tank for 30 seconds, raise and hold them above the dye so that excess dye could drip off, lower them into the rinse sink, rinse them, raise them out of the sink and onto the cart was performed well in excess of 300 times a day. It was necessary to hold the product suspended in the dye sink rather than letting it sit on the bottom because there was a build-up of dye at the bottom that would contaminate the product if it were placed into it.
9. Plaintiff had to dye several products together to expedite the process. The employer was always in a big hurry. Although other employees were supposed to dye parts, plaintiff usually had to do the dyeing for them, especially the heavier products. Plaintiff was never rotated out of the dye process during his employment with Kyocera.
10. During the last two weeks of each month, plaintiff dyed parts continually, seven days a week for 10 hours a day or longer, depending on how many parts had to be dyed and shipped to customers.
11. Kyocera installed a crane to help raise and lower the heavier parts. However, the crane slowed down production and plaintiff was told not to use it.
12. Dan Devine's testimony corroborated that of plaintiff concerning how plaintiff performed his job. Devine testified, and the Full Commission finds as fact, that some pieces were too large to fit the dye sink and had to be held and rotated by hand. This process included products heavier than 60 pounds for much longer than just 30 seconds.
13. Based on the testimony of plaintiff, Dan Devine and Linda Laughter, the Full Commission finds that defendants' proffered videos did not accurately depict plaintiff's job or the way that plaintiff performed his job. Consequently, the Full Commission gives the videos less weight than the testimony of plaintiff and his corroborating witnesses.
14. In late March or early April of 2002, as he was performing his duties dyeing parts, plaintiff began to notice pain in his left shoulder radiating upward to the base of his skull and downward into his elbow. Plaintiff had had no previous pain of this nature and he told his supervisor that the plain appeared to be a direct result of his repetitive handling, lifting and holding of parts weighing up to 80 pounds.
15. On March 26, 2002, plaintiff presented to Dr. Katherine Sloss, his family physician complaining of neck pain, headaches, and vertigo.
16. On April 8, 2002, plaintiff saw Joseph M. Silva at Henderson Chiropractic, for the pain in his neck, left shoulder and left arm. According to the medical records, his symptoms started on approximately March 26, 2002 and gradually became worse. The pain in his shoulder was aggravated by "standing, sitting, lying down, walking, riding in an auto, bending, twisting or turning, lifting, rising to walk after sitting, and with coughing or sneezing."
17. On April 8, 2002, plaintiff was also seen by his family physician, Dr. Katherine Sloss, at George Bond Medical Center for neck pain and vertigo. Dr. Sloss initially thought the problem was in plaintiff's neck because he had played football in his past. Plaintiff told her he thought the pain was coming from his shoulder, but she stated it was nerves up in his neck and ordered a cervical MRI, which was completed at Margaret R. Pardee Memorial Hospital on April 11, 2002. The MRI showed a small right-sided disc protrusion at C 3-4 with probable associated spurs.
18. Plaintiff returned to see Dr. Sloss on April 15, 2002 at which time she prescribed no heavy lifting and gave him muscle relaxants. She stated at that time she assumed the pain in his neck and in his shoulder was related to a disc. Dr. Sloss stated that upon reviewing the MRI, the disc seemed to be more right sided, and his symptoms were to the left. Dr. Sloss said that since the disc was right sided, it would not produce left sided symptoms in his neck and shoulder. Furthermore, Dr. Sloss stated that it was unlikely that his left trapezius tenderness was related to any cervical problems.
19. Plaintiff was also treated by Dr. Silva on April 15, 2002. His condition had not improved since April 8, 2002. Therapy was performed and home therapy and ice packs prescribed.
20. Plaintiff was seen and treated by Dr. Silva for nine additional visits through May 8, 2002. During this period of time his shoulder condition would improve slightly and then get worse. During the time period of April 8 through May 8, 2002, plaintiff was unable to work due to pain in his neck, shoulder and arm. The pain would improve slightly and then get worse. On May 8, 2002, plaintiff was seen by Dr. Sloss and Dr. Silva. Dr. Sloss noted that plaintiff had "several really bad days last week with stinging and pain up into his head and down his arm particularly on the left side but that seems to be improving." Dr. Silva felt plaintiff's condition had "regressed" since his visit of May 1, 2002 and recommended that he see an orthopedic surgeon for his ongoing neck and shoulder problems. Dr. Sloss recommended that plaintiff return to light duty work on May 14, 2002 with no heavy lifting or repetitive motions and that he continue chiropractic treatment.
21. Despite his light duty restrictions, the employer required plaintiff to dye "plungers." Because of the weight of the "plungers", no one else was able to dye these parts. The pain in his shoulder immediately returned. During this time period, plaintiff saw Dr. Silva (May 14, 16, and 20, 2002), and his shoulder condition either remained the same or regressed. On May 22, 2002, plaintiff returned to see Dr. Sloss; Dr. Sloss' notes indicate that plaintiff related an incident that happened on the Saturday prior to the visit when he used his left arm to throw a stuffed animal and developed "severe, sudden, sharp pain in his shoulder and since that time has had increasing pain." Dr. Sloss took him out of work and referred him to Dr. Mackel for an orthopedic consult.
22. Plaintiff testified, and the Full Commission finds as fact, that the "stuffed animal" referred to in Dr. Sloss' notes was approximately "four inches tall and two inches in diameter."
23. Plaintiff first saw Dr. Werner Brooks, an orthopedic surgeon at Blue Ridge Bone and Joint, on June 11, 2002. Dr. Brooks testified that upon examination, he found plaintiff to be tender about his rotator cuff. He testified that plaintiff described a long history of heavy work with his arm and shoulder. Dr. Brooks stated that at that point, he modified plaintiff's work and ordered an MRI. Dr. Brooks testified that the MRI was consistent with tendinopathy and spurring at AC joint, which means by this MRI, a partial tear. Surgery was performed on July 15, 2002. During the surgery, Dr. Brooks found that plaintiff had a full thickness rotator cuff tear, spurring in the acromion, fraying of the anterior and posterior labrum, slight fraying of the biceps tendon and impingement at the acromioclavicular joint.
24. In describing the general condition of plaintiff's rotator cuff and tendon found during surgery, Dr. Brooks testified, and the Full Commission finds as fact, as follows:
 It only had the tear, the tear was the full thickness hole or tear, was not particularly large, but the area of diseased tendon was very large, spanned a very broad area. So what was actually being sutured or repaired was less than healthy tissue. So in a sense it was a very unhealthy tendon for a person his age.
25. Following such a surgery, Dr. Brooks allows rotator cuffs to have a period of rest or healing and then a period of physical therapy, and plaintiff's care followed this regime. On October 15, 2002, Dr. Brooks noted that plaintiff's rotator cuff was doing better, but that he was having more and more pain over the biceps tendon. Dr. Brooks stated he modified his therapy without improvement. An MRI arthrogram was ordered and obtained, but it did not show that the rotator cuff was torn. Plaintiff returned two weeks later continuing to complain of shoulder pain and a second surgery was recommended to explore the causes of the pain. During surgery, Dr. Brooks stated he found a place on plaintiff's rotator cuff that had not healed and he proceeded to repair it. Dr. Brooks directed plaintiff to modify his activities, and therapy was re-initiated on April 8, 2003.
26. Dr. Brooks testified that plaintiff had been "disabled since initial injury." He further stated that plaintiff had been unable to work with his shoulder since he first began care with him. Plaintiff testified, and the Full Commission finds as fact, that despite two courses of physical therapy, he is still in pain and unable to work.
27. Although he continued to inform his supervisor of his condition and the treatment he underwent, he was told by his supervisor that it was "silly" to let Dr. Brooks work on his shoulder. He was denied his request for workers' compensation benefits, and was placed on short-term disability. At the time of the hearing before the Deputy Commissioner he was receiving long-term disability.
28. According to Dr. Brooks' testimony, plaintiff has reached maximum medical improvement, and will have a significant disability rating for his shoulder. He further stated, and the Full Commission finds as fact, "In this case, I do feel the work led to his tear . . . and I think any shoulder surgeon . . . will look at Cecil's tear and say, yeah, that work could have caused this tear". Dr. Brooks concluded his deposition by stating, "I've been asked to honestly say if this man's rotator cuff tear was consistent with the work he did, and I said yes.
29. During his deposition, Dr. Brooks was shown what was marked at the hearing as Plaintiff's Exhibit 1, a picture of plaintiff at his workstation. Dr. Brooks was familiar with this picture, since plaintiff had used it to explain the type of work he did. Dr. Brooks testified that plaintiff gave the following history of the type of work he performed:
 He would submerge them in that ink tank dye and then they'll look for cracks. And he would plunge these heavy ceramic parts into this dye and then have to pull them out, rinse all the dye completely off and see if there was a crack. There was a lot of reaching, picking up, reaching, picking up.
30. Dr. Brooks opined, and the Full Commission finds as fact, that the condition of plaintiff's shoulder indicated long-term development of his condition as opposed to sudden or acute development. Dr. Brooks was also asked the following questions:
 Q. Dr. Brooks, if the Deputy Commissioner finds as a matter of fact that plaintiff had been employed at Kyocera roughly from January 2000 through April of 2002 and that during that time period his primary job was to dye parts, different material parts but basically all of them shaped in a circular doughnut-type configuration, weighing between zero up to 50 to 60 pounds; and that job required him to physically hold those objects either individually or if they were smaller objects in a basket in the vat — as you call it, the dye tank — until they were dyed, I think it was a relatively short time, 30 seconds to a minute, and hold them and extend them in that dye tank, let them lie on the bottom, away from his body in the manner you talked about as far as arms extended; and, also, to hold them in that way when he rinsed them; to collect those objects from a rack, to get them in that position, and then to replace them to that rack or shelf; and he found that those weights — as I said, from zero to 60 pounds — was repeated many times during the day upward 100-200 times a day;
 Q. Do you have an opinion as to whether the motion and the motion that you described as far as extending his arms and dyeing those parts and the requirements of that job to do that, would put him at a greater risk to have the kind of problem that you saw in his shoulder and tendon, rotator cuff and tendon, than the general public"
A. Absolutely.
Q. So he would be at a greater risk?
A. Absolutely.
 Q. Would those job duties, if the Deputy Commissioner found, as I just related, if he found they were performed in that manner for that repeated times, do you have an opinion whether they would significantly contribute to or be a significant casual factor or causal factor in the condition you saw?
A. Yes.
 Q. Would it be — would that be a significant factor in that causation?
A. Yes.
 Q. Do you have an opinion satisfactory to yourself and to a reasonable degree of medical certainty as to the cause of the rotator cuff tear and the frayed biceps tendon that you witnessed in plaintiff's left shoulder as the cause of that injury?
A. Yes.
Q. What was that?
 A. This kind of work is daily trauma to the rotator cuff. I mean I think it can be done on an occasional basis, but when it's done frequently 50, 60 pounds, it overloads the muscle tendons insertion of the rotator cuff and compromises it and it begins to fail, like any mechanical instrument will fail if it's overloaded.
31. David N. DuPuy, M.D. performed an evaluation of plaintiff's left shoulder on March 2, 2004 at the request of the defendants. Based on his evaluation and review of the history, Dr. DuPuy testified that in his opinion,
 Repetitive motion has very little to do with rotator cuff tears. Our studies have shown that there's no greater incidence of rotator cuff tears in roofers, in carpenters, framers, truck drivers, blue collar, heavy labor than there is in white color, banker, lawyer, secretary, or other people who don't work, unemployed. It's the same percent across the board. It has much more to do with their anatomy and the way they're made and our thickening bones as we get older."
32. Asked on cross examination to explain the nature of the studies he relied upon in this opinion, Dr. DuPuy stated that the information he relied upon and characterized as "studies" might be in research done by the American Academy of Orthopedic Surgeons, some of the information may be coming from the American Academy of Disability Evaluating Physicians, some of it is common sense, and some of it is research presented in lecture form, textbook information.
33. Dr. DuPuy testified that plaintiff did not relate any history of having shoulder problems prior to the time period of the onset of a repetitive motion injury. Dr. DuPuy testified that the history regarding throwing "something with his left arm causing severe pain in the left shoulder" as provided to Dr. Sloss and related in her medical treatment note of May 22, 2002, was "consistent with a possible mechanism for a torn left rotator cuff."
33. Dr. DuPuy went further and stated that repetitive motion could cause a rotator cuff tear if the individual had "his arms up in that salute position and a constant above-shoulder-height, side-to-side, up-down motion could, but as I said, when we have done the research on the roofers and the framers and on the painters and on the carpenters, they have no greater incidence of rotator cuff tear than the normal population."
34. Dr. DuPuy was provided and reviewed an admittedly inaccurate video tape of plaintiff's work duties prior to his examination. (His medical treatment notes refer to his review of this video.) Plaintiff's counsel was not provided a copy of this tape prior to plaintiff's evaluation. Between the hearing and his deposition, Dr. DuPuy was provided the second video tape by the employer. Dr. DuPuy testified that if plaintiff's work requirements were as described to him and seen in the videos and presented in a hypothetical example by counsel for the employer, his opinion was that his work "would not have at all put him at a greater risk of rotator cuff tear than the normal population."
35. On cross examination, Dr. DuPuy stated that he performs approximately 45-60 medical examinations of shoulders per year and performs approximately 100 shoulder operations per year. Of the shoulders he has operated upon and seen in examination, Dr. DuPuy testified that the only ones he felt were work related were due to trauma or aggravation of a pre-existing condition; none were due to repetitive use occupational disease.
36. The Full Commission gives greater weight to the opinion testimony of Dr. Werner Brooks, the treating physician who is a board certified orthopedic surgeon. The Full Commission gives less weight to the opinion testimony of Dr. DuPuy, who doesn't believe that repetitive trauma in the workplace constituting an occupational disease has been the cause of any shoulder problem he has examined or operated on during his career in medicine. Also, based on his expertise and the fact that he actually treated plaintiff while Dr. DuPuy only conducted a single and brief examination and reviewed medical records, Dr. Brooks' testimony is deemed to be more credible than that provided by Dr. DuPuy.
37. Plaintiff's work with Kyocera placed him at increased risk for development of rotator cuff tears. Tearing of the rotator cuff is a condition characteristic of plaintiff's employment with Kyocera. Plaintiff's work with Kyocera was the cause of his injuries.
38. Because of his compensable occupational disease, plaintiff has been unable to earn wages since April 8, 2002. To help him bear his pain plaintiff has been prescribed and has taken narcotic medicine. The combination of pain and the effects of his medications have made it not possible for plaintiff to obtain and keep a wage-earning job.
39. Plaintiff's rotator cuff might well have been worn from heavier work he performed before being employed by Kyocera. However, his last injurious exposure occurred while he was employed there. He was able to work and earn wages, and his worn rotator cuff was non-disabling, until his work at Kyocera finally made the rotator cuff tear.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff has fully met his burden of proof to show that his torn left rotator cuff is the product of an occupational illness within the meaning of the North Carolina Workers' Compensation Act. N.C. Gen. Stat. § 97-53(13).
2. The greater weight of the competent evidence establishes that plaintiff's work with Kyocera did place him at an enhanced risk for developing a torn left rotator cuff. Rutledge v. Toltex Corp., 308 N.C. 85,301 S.E.2d 359 (1983).
3. The greater weight of the competent evidence establishes that a torn left rotator cuff is a condition characteristic of plaintiff's employment with Kyocera.
4. In reaching the conclusions shown above, the Full Commission found the testimony of Dr. Brooks to be both critical and persuasive. Although the testimony of Dr. DuPuy was given consideration, the Full Commission took note of the hands-on experience of Dr. Brooks with this patient, while Dr. DuPuy only made one examination and conducted medical record review.
5. Plaintiff's last injurious exposure occurred while working for Kyocera and it is the responsible party for his occupational disease.Harris v. North American Products, 125 N.C. App. 349, 481 S.E.2d 321
(1997).
6. "[A]pportionment is not proper where the evidence before the Commission renders an attempt at apportionment between work-related and non-work related causes speculative or where there is no evidence attributing a percentage of the claimant's total incapacity to her compensable injury, and a percentage to the non-compensable condition."Royce v. Rushco Food Stores, Inc., 139 N.C. App. 322, 327-28,533 S.E.2d 284, 288 (2000) (quoting Counts v. Black Decker Corp.,121 N.C. App. 387, 390-91, 465 S.E.2d 343, 346 (1996) (citations omitted)); Konrady v. United States Airways, Inc., 165 N.C. App. 620,629, 599 S.E.2d 593, 599 (2004).
7. Plaintiff is entitled to weekly compensation as a result of his compensable occupational disease until his disability comes to an end. N.C. Gen. Stat. § 97-29.
8. Plaintiff is entitled to medical compensation including such treatment and medicines that might effect a cure, provide relief or reduce the period of disability. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Subject to attorneys fees set forth below, defendants shall pay to plaintiff compensation of $279.07 per week from April 8, 2002, until he is able to earn wages equal to or more than his average weekly wage as of April 8, 2002. Compensation that has already accrued shall be paid in a lump sum, with 25% of such sum to be paid by defendants directly to plaintiff's counsel as reasonable attorney fees. Thereafter, defendants shall make weekly payments of $279.07 to plaintiff, with every fourth check going directly to plaintiff's counsel.
2. Defendants shall pay interest at 8 percent per year from March 31, 2004.
3. Defendants shall pay, or reimburse those who paid, all medical expenses resulting from plaintiff's occupational disease to the extent those expenses were incurred in an attempt to effect a cure, provide relief or return plaintiff to work.
4. Defendants shall pay the costs.
This 7th day of July 2005.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_________________ PAMELA THORPE YOUNG COMMISSIONER